J-S05035-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : | |
| SAMUEL CARR | : | |
| Appellant | : | No. 1707 EDA 2024 |

Appeal from the Judgment of Sentence Entered May 29, 2024
In the Court of Common Pleas of Chester County Criminal Division at
No(s): CP-15-CR-0000525-2017

BEFORE: BOWES, J., MURRAY, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.: **FILED FEBRUARY 10,2025**

Appellant, Samuel Carr, appeals from the judgment of sentence entered in the Court of Common Pleas of Chester County following his conviction by a jury on two counts of possession with the intent to deliver a controlled substance ("PWID"), one count of dealing in proceeds of unlawful activities, one count of criminal use of a communication facility, one count of possession of a firearm prohibited, one count of corrupt organizations, one count of conspiracy (as to PWID), one count of firearms not to be carried without a license, and one count of flight to avoid apprehension.[1] Appellant's counsel has filed a petition seeking to withdraw his representation, as well as a brief

---

[*] Former Justice specially assigned to the Superior Court.

[1] 35 P.S. § 780-113(a)(30), and 18 Pa.C.S.A. §§ 5111(a)(1), 7512(a), 6105(a)(1), 911(b)(1), 903, 6106(a)(1), and 5126(a), respectively.

pursuant to **Anders v. California**, 386 U.S. 738, 87 S.Ct. 1396 (1967), and **Commonwealth v. Santiago**, 602 Pa. 159, 978 A.2d 349 (2009) (hereinafter "**Anders** brief"). After a careful review, we grant counsel's petition to withdraw and affirm Appellant's judgment of sentence.

The relevant facts and procedural history are as follows: In 2016, the Pennsylvania State Police and Chester County Detectives initiated a joint investigation into a drug trafficking organization, which was operating in Chester County. Police noticed an influx of methamphetamine to Chester County, which coincided with the release of Richard Maitre from prison. After securing court-approved wiretaps on several of Mr. Maitre's cell phone numbers, the police identified Appellant as being involved in the Maitre drug trafficking organization.[2] Accordingly, on March 6, 2017, the Commonwealth filed an Information charging Appellant with numerous crimes.

On March 4, 2024, Appellant, represented by counsel, proceeded to a jury trial. During trial, Chester County Detective John DiBattista testified he was involved in the investigation of the Maitre drug trafficking organization, and more specifically, he conducted surveillance throughout the investigation from 2016 to 2017. N.T., 3/4/24, at 44. After the police received wiretaps and search warrants, on January 12, 2017, Detective DiBattista executed a

---

[2] Several arrests, including that of Mr. Maitre, whom the police determined was the "mastermind," were made in connection with the drug activities. The Commonwealth refers to this drug ring as "the Maitre drug trafficking organization." We shall do so, as well.

search warrant at a house on Chesterville Road in New London Township. *Id.* at 45.

During the execution of the search warrant, the police seized from throughout the house ten plastic shopping bags containing suspected methamphetamine, a black semiautomatic firearm containing a magazine with live ammunition, a handgun, a plastic heat-sealed bag containing suspected methamphetamine in a paper shredder, Ziplock baggies, a Ziplock vacuum sealer, two Ziplock bags containing suspected marijuana, one large Ziplock bag containing three small bags containing suspected marijuana, a plastic knotted bag containing suspected methamphetamine, and the driver's license of Richard Maitre. *Id.* at 45-55. Detective DiBattista indicated several vehicles were parked at the residence on Chesterville Road. *Id.* at 55. Specifically, a BMW, a blue Audi, and a black Mercedes Benz were parked at the residence. *Id.*

Detective DiBattista indicated that, on January 3, 2017, he was conducting surveillance at numerous places, including at Giordano's restaurant in the Kennett area of Chester County. Specifically, the detective sat at the restaurant's bar in plain clothes, and he overheard a conversation between Appellant and an unknown male. *Id.* at 57-61. Specifically, he indicated the topic of this conversation was that a source who supplied drugs was arrested in California for domestic assault, and this arrest was "messing things up." *Id.* at 61. The detective testified that, during the conversation,

Appellant received a phone call, at the conclusion of which Appellant announced to the unknown male that "Richie was still in Oxford," so Appellant was going to drive there to meet him.  ***Id.***

On cross-examination, Detective DiBattista indicated Barry Sydenstricker was the registered owner of the house on Chesterville Road. ***Id.*** at 62.  The detective testified Mr. Sydenstricker participated in the Maitre drug trafficking organization.  ***Id.*** at 63-64.  Detective DiBattista testified that, during his surveillance, he discovered Appellant drove a white Mazda.  ***Id.***

Pennsylvania State Police Corporal Timothy J. O'Connor testified he conducted surveillance of the Maitre drug trafficking organization in 2016 and 2017.  N.T., 3/5/24, at 5.  Additionally, after the police secured and executed search warrants, he searched the black Mercedes Benz, which was parked at the Chesterville Road residence.  ***Id.*** at 6.  Therein, he discovered a vacuum sealed bag containing methamphetamine, a vacuum sealed bag containing marijuana, $9,000.00 in U.S. currency, and an Avis rental document for Alberto Andrews.  ***Id.*** at 8, 15.

Corporal O'Connor testified that, on December 18, 2016, he conducted surveillance at a Lowes parking lot in London Grove Township. ***Id.*** at 11. During the surveillance, Appellant pulled into the parking lot driving a white Mazda, and he parked next to a BMW in which Mr. Maitre was seated in the driver's seat.  ***Id.*** at 14.

On cross-examination, the corporal testified the police determined Mr. Andrews was a distributor to the Maitre drug trafficking organization. *Id.* at 16. Corporal O'Connor testified that, during conversations intercepted via a wiretap, the police learned the meeting between Appellant and Mr. Maitre was going to take place at the Lowes parking lot, and he observed Appellant hand Mr. Maitre a package, which appeared to contain currency. *Id.* at 17.

Pennsylvania State Police Trooper Christopher Winesburg testified that, on January 23, 2017, he was working as a patrol unit supervisor when he received information that Appellant, who had an active warrant for his arrest, was traveling eastbound on Route 741 in Lancaster County with several undercover police vehicles following him. *Id.* at 22. The trooper saw Appellant's vehicle, and he activated the lights and sirens on his patrol unit. *Id.* at 23. Appellant "went off the roadway into a lawn of a residence, traveled behind the residence, and basically got stopped before he had entered a wooded area." *Id.* at 23-24. Appellant was then taken into custody. *Id.* at 24. Appellant informed the trooper that he had a firearm in the vehicle, and the corporal observed in plain view a loaded handgun lying on the front passenger's seat. *Id.* at 32.

Trooper Winesburg testified Appellant consented to a search of his vehicle, and, therein, the trooper found a loaded magazine next to the handgun, $2,095.00 in U.S. currency, and four cell phones. *Id.* at 36-38. The

trooper ran a check and determined Appellant did not have a concealed carry gun permit. *Id.* at 38.

Alice Fox, an employee of Lima Regional Labs, which is a Pennsylvania State Police facility, testified she is a drug analyst. *Id.* at 42-43. She testified she analyzed the substances seized by the police from the Chesterville Road residence. *Id.* at 51. She indicated that she weighed and analyzed the substances in the various Ziplock bags. One bag contained 1,295 grams of methamphetamine, another bag contained 281.30 grams of marijuana, a separate bag contained 129.77 grams of marijuana, another bag contained 451.35 grams of methamphetamine, a separate bag contained 885 grams of methamphetamine, and a final bag contained 113.73 grams of methamphetamine. *Id.* at 51-53. She testified her testimony was given to a reasonable degree of scientific certainty. *Id.* at 54.

Chester County Detective Joseph Nangle was qualified as an expert in the field of drug trafficking investigations. *Id.* at 61. Detective Nangle explained that, within drug trafficking organizations, there is usually a hierarchy with one main drug dealer, who has several dealers working for him. *Id.* at 66. The main drug dealer has suppliers, who give him the drugs. *Id.* He indicated that drug trafficking organizations use "stash houses," where drugs, money, and firearms are stored, as well as "trap houses," from where drugs are sold. *Id.* at 68. He testified the people involved in the drug

trafficking organization usually communicate via cell phones, and they often use coded language. *Id.* at 69-70.

As it relates specifically to the Maitre drug trafficking organization, Detective Nangle testified that, in 2016, the police began to discover an influx of quality methamphetamine into Chester County. *Id.* at 74. Informants provided information to the police indicating that Mr. Maitre was importing the methamphetamine into Chester County from labs in Mexico. *Id.* at 75. Thus, the police began to conduct surveillance of Mr. Maitre to determine with whom he was meeting, and after obtaining Mr. Maitre's phone numbers, they received court orders for a pen register trap and trace. *Id.* at 77. With this device, the police determined with which other cell phone numbers Mr. Maitre was communicating; however, they could not listen to the conversations or read text messages. *Id.*

Additionally, after the police determined through surveillance which vehicles were involved in the Maitre drug trafficking organization, the police received court orders to put GPS trackers on the vehicles. *Id.* Also, the police utilized pole cameras, including one on a pole near the residence of Mr. Sydenstricker on Chesterville Road. *Id.* at 79. The police determined the residence on Chesterville Road was used as a stash house by Mr. Maitre. *Id.* at 80. Further, Detective Nangle testified several controlled buys were utilized in this case. *Id.* at 81.

Based on the evidence collected from the police investigation from January to December of 2016, the police received court orders for non-consensual wiretaps on Mr. Maitre's cell phones in December of 2016. *Id.* at 83. Accordingly, the police began to listen to Mr. Maitre's cell phone conversations and read his text messages. *Id.* at 88. Based on the wiretaps, the police determined that Mr. Maitre used a cell phone number ending in 9937, Appellant used a cell phone number ending in 9811, and Michael Zelek used a cell phone number ending in 8966. *Id.* at 90.

During intercepted wire communications, the police determined several people supplied methamphetamine to Mr. Maitre, including Kiere Brown (nicknamed "Greasy"), Mr. Andrews (nicknamed "Ohio"), Jermaine Jackson (nicknamed "Main"), and Stephen Westmoreland (nicknamed "Dreamer"). *Id.* at 96. Moreover, they determined Mr. Zelek (nicknamed "Big Head") was a "sub-distributor of Richard Maitre." *Id.* at 97.

As it pertains to Appellant, Detective Nangle testified as follows:

> [Appellant] could be described as a right-hand man to [Mr.] Maitre. He did a variety of things for him. He collected debt that was owed to Maitre. He distributed drugs for [Mr.] Maitre. He also obtained drugs from [Mr.] Maitre. He also—did I mention he was an enforcer, if needed? He would collect when people did not want to pay.

*Id.* at 98.

Moreover, Detective Nangle testified that, during this time, Mr. Maitre lived on South Willow Street in Kennett Square, and he drove a gold/silver BMW and a white Lincoln Aviator. *Id.* at 92. Mr. Zelek lived in Lancaster, and

he drove a blue Audi. *Id.* at 93. Appellant resided on Park Avenue in Quarryville, and he drove a white Mazda. *Id.*

At this point, Detective Nangle testified about various conversations and text messages intercepted by the wiretap, which was for Mr. Maitre's cell phone number ending in 9937. *Id.* at 104. Specifically, the wiretap intercepted several conversations between Mr. Maitre and Appellant, who used his cell phone number ending in 9811. *Id.* at 105. Detective Nangle specifically testified that he became familiar with Appellant's voice, and he has no doubt Appellant was using the 9811 number. *Id.* at 110.

Detective Nangle testified that, in a text message between Appellant and Mr. Maitre, Appellant indicated, "I got ten more for ya," and Mr. Maitre responded, "Cool." *Id.* at 113. Appellant then responded, "That leaves 10,200." *Id.* Detective Mangle testified that, in his expert opinion and from context, Appellant was informing Mr. Maitre that he "had $10,000 in drug funds that he owed [Mr.] Maitre [and] that he was going to be giving him. [Mr.] Maitre confirms that after that $10,000 is received, that only $10,200 is remaining on his drug debt." *Id.*

On December 18, 2016, in a separate text message between Appellant and Mr. Maitre, Appellant indicated, "Come get this loot." *Id.* at 114. Mr. Maitre responded, "Where you at now? Just waking up." *Id.* Appellant then called Mr. Maitre and indicated, "I'm here." *Id.* Appellant informed Mr. Maitre, "Just pulled in, where you at?" *Id.* at 115. Detective Nangle indicated this

telephone conversation took place between Appellant and Mr. Maitre when Appellant was attempting to locate Mr. Maitre's vehicle in the Lowes parking lot during Corporal O'Connor's surveillance. *Id.* at 116. Detective Nangle opined the December 18, 2016, communications and meeting demonstrated that Mr. Maitre met with Appellant to retrieve drug debt money from Appellant. *Id.* at 117.

In a separate communication on December 18, 2016, Appellant called Mr. Maitre and said, "We are heading out. You going to make it?" *Id.* Mr. Maitre responded, "Yeah, Imma leave soon." *Id.* Appellant followed up the conversation with a text message to Mr. Maitre, which indicated, "Bring that yola." *Id.* at 118. Then, in a telephone call, Mr. Maitre informed Appellant, "What I'm saying is I just left Barry's, but if you want the yola, I have to run back to Kennett." *Id.* at 119. Detective Nangle opined that "yola" is a term that Mr. Maitre and members of his organization used to refer to cocaine. *Id.* Thus, he opined that in these communications Appellant was asking for cocaine, and Mr. Maitre was informing him that he could obtain it. *Id.*

Next, Appellant sent a text message to Mr. Maitre and asked, "Where you at?" *Id.* Mr. Maitre responded, "Going to restaurant." *Id.* at 120. Mr. Maitre then sent a text message to Appellant, which indicated, "I'm at the restaurant upstairs in the casino." *Id.* Detective Nangle testified that, at this time, surveillance revealed Mr. Maitre was at the Delaware Park Casino. *Id.* Mr. Maitre then sent a text to Appellant, which indicated, "After we eat, I'll pry

- 10 -

take him down the ST to my sister's crib and come back to gamble. But when I go to leave just meet me out front or something." *Id.* Detective Nangle testified that, based on the messages, as well as police surveillance, Appellant met Mr. Maitre at the Delaware Park Casino on December 18, 2016. *Id.* at 121.

Detective Nangle testified that, in a different telephone call, Appellant and Mr. Maitre discussed the receipt of a shipment of methamphetamine from Maryland, as well as going to Arizona to pick up methamphetamine from a different source. *Id.* at 122. Additionally, during this conversation, Appellant informed Mr. Maitre that he would "get some bread for him," which Detective Nangle testified was a reference to money. *Id.*

On a separate date, Appellant sent a text message to Mr. Maitre, which indicated, "I need an onion or two." *Id.* at 123. He then said, "or 14…or 27." *Id.* Mr. Maitre responded, "What number did you say?" *Id.* Appellant responded, "Of." *Id.* Mr. Maitre said, "Okay," and Appellant responded, "So really only one." Mr. Maitre texted back, "See old head." *Id.* at 124.

Detective Nangle testified that an "onion" is what "the Maitre organization routinely used when talking about an ounce quantity of methamphetamine." *Id.* He noted "Of" was Appellant's way of saying "our thing." *Id.* He indicated "old head" was the nickname of Mr. Sydenstricker. *Id.* Accordingly, Detective Nangle opined that, based on the text messages,

Appellant needed an ounce or two of methamphetamine, and Mr. Maitre directed him to go to Barry Sydenstricker to get it. *Id.*

In later phone calls and text messages, on January 3, 2017, Mr. Maitre discussed waiting for "Greasy," who supplied methamphetamine to Mr. Maitre, and Appellant indicated he could go pick it up. *Id.* at 125. Later, Mr. Maitre texted Appellant, "I'm getting five today," and Appellant replied, "Need two of them." *Id.* at 126. Detective Nangle opined that, in these text messages, Mr. Maitre advised Appellant he was getting five pounds of methamphetamine, and Appellant responded he would need two of the five pounds. *Id.*

In other text messages, Appellant informed Mr. Maitre he would give him $7,000.00 and advised he had "his loot." *Id.* at 128. In a telephone call, Mr. Maitre told Appellant, "Main going to bring me down ten tonight." *Id.* Appellant responded, "All right. Is it going to Barry's with you or coming all the way up?" *Id.* Detective Nangle opined that "Main" was Mr. Jackson, who was bringing ten pounds of methamphetamine to Mr. Maitre, and Appellant was asking whether Mr. Maire was taking the methamphetamine to Mr. Sydenstricker's residence. *Id.*

However, in text messages sent between Appellant and Mr. Maitre on January 4, 2017, it became clear "Main" did not bring the methamphetamine as promised, so Appellant told Mr. Maitre that he could get it from "Ohio," which is the nickname for Mr. Andrews. *Id.* at 132. However, Mr. Maitre

informed Appellant that "Ohio's in FL." *Id.* Appellant texted back to Mr. Maitre, "I think our best bet is to take the trip and drive back." *Id.*

Appellant then called Mr. Maitre, and they had a conversation regarding the need to obtain methamphetamine. *Id.* at 142. Detective Nangle testified the substance of the telephone call was that Appellant told Mr. Maitre he needed methamphetamine, and the duo discussed flying to Arizona to obtain some. *Id.* In a subsequent text message, Mr. Maitre informed Appellant he was setting up the flight, and he needed Appellant's information, including his date of birth, to book it. *Id.* at 145. Detective Nangle opined that, after reviewing the intercepted phone calls and text messages, it became clear that Mr. Maitre booked a flight for him and Appellant to travel to Arizona to pick up methamphetamine with the idea they would drive back in a rental car. *Id.* at 148. A pole camera installed by the police near a residence revealed Appellant and Mr. Maitre meeting with luggage. *Id.* at 152.

However, a subsequent telephone call between Mr. Maitre and Mr. Andrews revealed the Arizona trip turned out to be a "dummy mission." *Id.* at 153. Detective Nangle indicated this implied Mr. Maitre and Appellant went to Arizona, but they were unsuccessful in getting the methamphetamine. *Id.* Subsequent intercepted calls and text messages revealed they pivoted and sought supply from Mr. Westmoreland. *Id.* at 154. In a phone conversation, Appellant told Mr. Maitre that, if Mr. Westmoreland could get the supply, he would give Mr. Westmoreland the money, pick up the drugs, and take them

to a customer in the Poconos. *Id.* Meanwhile, Mr. Maitre indicated Mr. Andrews was returning from Florida, and he would try to get a supply from him. *Id.* at 155.

Detective Nangle testified that additional intercepted communications between Mr. Maitre and Appellant suggested they were having difficulty getting a supply. *Id.* at 156. Mr. Maitre asked Appellant to call "his cuz in FL and see if he can find a new outlet," but Appellant informed Mr. Maitre he "did that last week." *Id.* at 158. Appellant then sent a text message, which indicated he may have "a dope route." *Id.* Appellant also informed Mr. Maitre that he had a customer that he usually gives "something small like a quarter and then he goes eight balls and quarters. I bet him a whole jaunt—I better get him a whole jaunt." *Id.* at 160. Detective Nangle opined that "a jaunt" refers to "a pound of methamphetamine." *Id.*

Detective Nangle indicated that, from various text messages and phone calls, it became clear that Mr. Maitre found a source, who gave him three pounds of methamphetamine. *Id.* at 165. However, he was unable to give any to Appellant because he already sold two. *Id.* Mr. Maitre told Appellant that, after he collected some money from his customers, he would get eight pounds of methamphetamine from Mr. Andrews, and Mr. Jackson told him that he could get him some, as well. *Id.* Detective Nangle testified Appellant became frustrated because he had to wait so long to get a supply of methamphetamine, and he advised Mr. Maitre they should try to find a faster

source. *Id.* at 164. Mr. Maitre texted Appellant that he would give Appellant "some bread" to keep him "floating" until he received a supply of methamphetamine for Appellant to sell. *Id.* at 165.

Michael Zelek, who confirmed his nickname is "Big Head," testified he pled guilty in connection with the Maitre drug trafficking organization, and he admitted he sold and used methamphetamine. *Id.* at 173. Mr. Zelek testified he met Appellant through Mr. Maitre in 2014 or 2015. *Id.* at 175. Mr. Zelek indicated he received his supply of drugs to sell from Mr. Maitre, who was the "head" of the organization. *Id.* at 177.

Mr. Zelek confirmed he went to Mr. Sydenstricker's residence in Chester County to get drugs, and, sometimes, Mr. Maitre "fronted" the drugs to Mr. Zelek. *Id.* at 179. Mr. Zelek explained this meant Mr. Maitre gave him the methamphetamine, and Mr. Zelek paid him back after he sold it. *Id.* Accordingly, at any given time, he was in debt to Mr. Maitre. *Id.*

Mr. Zelek testified that Mr. Maitre often sent Appellant to collect money from him. *Id.* at 179. He testified that he remembers an incident where Appellant brought him five pounds of methamphetamine to sell, and soon thereafter, he came to collect the money for it. *Id.* at 180. Mr. Zelek testified that, when he went to Mr. Sydenstricker's residence to retrieve drugs, he saw Appellant and Mr. Maitre at the residence. *Id.* at 181. Mr. Zelek testified that, on one occasion, he saw fifty pounds of methamphetamine at Mr. Sydenstricker's residence. *Id.* at 182.

Mr. Zelek indicated that, in January of 2017, Mr. Maitre told him that he and Appellant were going to Arizona to get drugs from "Greasy." *Id.* However, although Appellant and Mr. Maitre made the trip, they were unable to secure the drugs. *Id.* at 183.

Mr. Zelek testified that, on January 12, 2017, he was at Mr. Sydenstricker's residence on Chesterville Road to buy a pound of drugs when the police executed a search warrant. *Id.* at 183-84. Specifically, Mr. Zelek testified he "had the drugs in [his] hand, and [when] the cops hit the door, [he] took the drugs[,] threw [them] at the cops[,] and then ran." *Id.* at 184. Mr. Zelek indicated he, along with Mr. Maitre, ran "as fast as [they] could across the street, over a hill, like literally not even 250 yards, and hid inside of a shed for like seven hours." *Id.* They then ran through "a bunch of woods to somebody else's house, Teddy Morrison[.]" *Id.* A few weeks later, he was arrested. *Id.* at 185.

Mr. Zelek confirmed he saw Appellant often with Mr. Maitre, and Appellant was "[t]he enforcer, somebody who came and collected debts, somebody who took care of things if [Mr. Maitre] needed them taken care of that [Mr. Maitre] couldn't take care of." *Id.*

On cross-examination, Mr. Zelek indicated that Appellant once brought him five pounds of methamphetamine and told him it was from Mr. Maitre. *Id.* at 191. Mr. Zelek indicated he weighed the drugs to confirm its weight. *Id.* He indicated that, other times, Appellant came to collect money, which

Mr. Zelek owed Mr. Maitre for drugs. *Id.* at 192. Also, on one occasion, Appellant came to Mr. Zelek's home with Mr. Maitre. *Id.* Mr. Zelek also described the roles of Mr. Andrews as a supplier to Mr. Maitre, and Mr. Sydenstricker as the owner of a stash house for Mr. Maitre. *Id.* at 196-97. Mr. Zelek indicated many more people were involved in the drug trafficking organization; however, he was not sure of everyone's names or their levels of participation. *Id.*

On redirect examination, Mr. Zelek indicated that, usually, Mr. Maitre supplied him with just one pound of methamphetamine, so the incident involving five pounds "sticks out in his mind." *Id.* at 200. Mr. Zelek indicated that he was "fronted" the five pounds of methamphetamine, and he was supposed to pay back $70,000.00 to Mr. Maitre. *Id.* at 201.

At this point, the Commonwealth recalled Detective Nangle to the stand. Detective Nangle confirmed search warrants were issued for numerous houses, including Mr. Sydenstricker's home. N.T., 3/6/24, at 14. He indicated that the information the police had gathered from the wiretaps, surveillance, and other sources revealed that Mr. Andrews, who drove a rented Mercedes SUV, made a delivery of methamphetamine to Mr. Sydenstricker's home just before the search warrants were executed. *Id.* He then drove back to Ohio in Mr. Maitre's BMW with the goal of getting more methamphetamine to bring back to Mr. Sydenstricker's home; however, the police executed the search warrants before Mr. Andrews returned. *Id.* at 15. The police had a GPS

tracker on Mr. Maitre's BMW, and Detective Nangle noted that Mr. Sydenstricker's movements matched the conversations being intercepted by the wiretap. *Id.*

Accordingly, when the police executed the search warrant at Mr. Sydenstricker's home on January 12, 2017, the rented Mercedes Benz SUV, which Mr. Maitre was using since Mr. Andrews had his BMW, was still parked at Mr. Sydenstricker's residence. *Id.* at 16. Detective Nangle confirmed that, based on the lab report from Ms. Fox, the police seized a large amount of methamphetamine from Mr. Sydenstricker's home on Chesterville Road. *Id.* at 19. Detective Nangle opined that the methamphetamine was not intended for personal use; but rather, it was intended to be distributed for sale to others. *Id.* at 22.

Detective Nangle confirmed Appellant was not present at Mr. Sydenstricker's home on Chesterville Road when the police executed the search warrant on January 12, 2017. *Id.* A warrant was issued for Appellant's arrest, and Appellant was eventually apprehended on January 23, 2017. *Id.* Specifically, Detective Nangle explained the police received a court order to allow the phone company to "ping" Appellant's cell phone every fifteen minutes, which provided the general location of Appellant's cell phone. *Id.* at 23.

On January 23, 2017, the "pings" indicated Appellant was at the Walmart in Lancaster, and Detective Nangle, who was driving an unmarked

police vehicle, went to the parking lot to see if he could find Appellant. ***Id.*** at 27. Detective Nangle saw a man, whom he believed was Appellant; however, the man did not enter a white Mazda. ***Id.*** Rather, the man entered a black Mazda, which was otherwise the same make and model as Appellant's white Mazda. ***Id.*** Detective Nangle got closer to the vehicle and discovered it was Appellant driving the black Mazda. ***Id.*** at 28.

Detective Nangle began to follow Appellant, and he advised the Pennsylvania State Police, as well as Chester County Detectives, that Appellant was traveling eastbound on Route 30 in a black Mazda. ***Id.*** Corporal Winesburg responded and attempted to set up a roadblock to arrest Appellant; however, Appellant made an abrupt turn in the opposite direction, but the police eventually got in front of him. ***Id.*** at 29. Accordingly, Appellant "turned the car to the right and went down an embankment in the front yard of a residence on 741 in Gap, Pennsylvania." ***Id.*** at 30. Appellant's flight ended when the front of his black Mazda collided with a tree. ***Id.*** Appellant immediately exited the car, raised his hands, and surrendered to the police. ***Id.***

Detective Nangle noted he observed in plain view on the front passenger's seat a loaded handgun and one magazine. ***Id.*** He confirmed with the Pennsylvania State Police that Appellant did not have a license to carry a firearm at this time. ***Id.*** at 32-33. Approximately two hours later, the

detective provided Appellant with his ***Miranda***[3] rights and interviewed Appellant, who waived his ***Miranda*** rights. ***Id.*** at 36-37. Appellant admitted he knew he was wanted by the police, so he painted his Mazda in an effort to avoid being detected by law enforcement. ***Id.*** at 37. Appellant indicated he had the handgun for his safety. ***Id.*** at 38. He denied knowing Mr. Maitre. ***Id.*** at 40.

Detective Nangle indicated that Appellant's participation as Mr. Maitre's "right-hand man" was largely confirmed by the intercepted wiretap communications, and he noted the pole camera recorded Appellant entering and exiting Mr. Sydenstricker's home on Chesterville Road throughout the investigation. ***Id.*** at 110-14. Moreover, Detective Nangle indicated the police determined Mr. Maitre had a second stash house on Hipkins Road, and a pole camera recorded Appellant entering and exiting this house throughout the investigation. ***Id.*** at 113.

At the conclusion of all evidence, the jury convicted Appellant of the offenses indicated *supra*. On May 29, 2024, Appellant, represented by counsel, proceeded to a sentencing hearing, at the conclusion of which the trial court imposed an aggregate of 34.5 years to 69 years in prison. Appellant filed a timely, counseled post-sentence motion contending, *inter alia*, the jury's verdicts were against the weight of the evidence and the trial court

---

[3] ***Miranda v. Arizona***, 384 U.S. 436, 86 S.Ct. 1602 (1966).

abused its discretion in imposing sentence. The trial court denied the post-sentence motion on June 11, 2024, and this timely, counseled appeal followed. All Pa.R.A.P. 1925 requirements have been met. On November 5, 2024, Appellant's court-appointed counsel filed a petition to withdraw his representation along with an **Anders** brief. Appellant did not file a *pro se* brief or a brief through privately retained counsel.

Prior to addressing any issue raised on appeal, we must first resolve counsel's petition to withdraw. **Commonwealth v. Goodwin**, 928 A.2d 287, 290 (Pa.Super. 2007) (*en banc*). There are procedural and briefing requirements imposed upon an attorney who seeks to withdraw on appeal pursuant to which counsel must:

> 1) petition the court for leave to withdraw stating that, after making a conscientious examination of the record, counsel has determined that the appeal would be frivolous; 2) furnish a copy of the brief to the [appellant]; and 3) advise the [appellant] that he or she has the right to retain private counsel or raise additional arguments that the [appellant] deems worthy of the court's attention.

**Commonwealth v. Cartrette**, 83 A.3d 1030, 1032 (Pa.Super. 2013) (*en banc*) (citation omitted). In addition, our Supreme Court in **Santiago** stated that an **Anders** brief must:

> (1) provide a summary of the procedural history and facts, with citations to the record; (2) refer to anything in the record that counsel believes arguably supports the appeal; (3) set forth counsel's conclusion that the appeal is frivolous; and (4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

- 21 -

*Santiago*, *supra*, 978 A.2d at 361. Counsel also must provide the appellant with a copy of the *Anders* brief, together with a letter that advises the appellant of his or her right to "(1) retain new counsel to pursue the appeal; (2) proceed *pro se* on appeal; or (3) raise any points that the appellant deems worthy of the court's attention in addition to the points raised by counsel in the *Anders* brief." *Commonwealth v. Nischan*, 928 A.2d 349, 353 (Pa.Super. 2007) (citation omitted). Substantial compliance with the *Anders* requirements is sufficient. *See id.*

Herein, counsel filed a petition to withdraw as counsel and an *Anders* brief. His brief and petition substantially comply with the technical requirements of *Anders* and *Santiago*. Moreover, counsel has provided this Court with a copy of the letter, which he sent to Appellant advising him of his right to retain new counsel, proceed further with his case *pro* se, and raise any points that he deems worthy of this Court's attention. *See Commonwealth v. Millisock*, 873 A.2d 748 (Pa.Super. 2005). Therefore, we proceed to examine the issues counsel identified in the *Anders* brief and then conduct "a full examination of all the proceedings, to decide whether the case is wholly frivolous." *Commonwealth v. Yorgey*, 188 A.3d 1190, 1195 (Pa.Super. 2018) (*en banc*) (quotation omitted).

In the *Anders* brief, counsel sets forth the following issues: (1) Was the evidence sufficient to sustain Appellant's convictions; (2) Were the jury's verdicts against the weight of the evidence; (3) Did the Commonwealth

commit a ***Brady***[4] violation; and (4) Was the trial court's sentence an abuse of discretion?[5]

Initially, we turn to the issue of whether the evidence was sufficient to sustain Appellant's convictions. As with any claim that contests whether there was sufficient evidence to sustain a conviction, we employ a well-settled series of legal precepts:

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying [the above] test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

***Commonwealth v. DiStefano***, 782 A.2d 574, 582 (Pa.Super. 2001) (citations and quotation marks omitted).

---

[4] ***Brady v. Maryland***, 373 U.S. 83, 83 S.Ct. 1194 (1963).

[5] We have renumbered Appellant's issues for the ease of discussion.

J-S05035-25

In his first issue, Appellant challenges the sufficiency of the evidence supporting his convictions for PWID, dealing in proceeds of unlawful activities, criminal use of a communication facility, corrupt organizations, and conspiracy (as to PWID).[6]

The Crimes Code defines PWID as follows:

**§ 780-113. Prohibited acts; penalties**

(a) The following acts and the causing thereof within the Commonwealth are hereby prohibited:

\*\*\*

(30) Except as authorized by this act, the manufacture, delivery, or possession with intent to manufacture or deliver, a controlled substance by a person not registered under this act, or a practitioner not registered or licensed by the appropriate State board, or knowingly creating, delivering or possessing with intent to deliver, a counterfeit controlled substance.

35 P.S. § 780-113(a)(30) (bold in original).

The Crimes Code relevantly defines dealing in proceeds of unlawful activities as follows:

**§ 5111. Dealing in proceeds of unlawful activities**

**(a) Offense defined.--**A person commits a felony of the first degree if the person conducts a financial transaction under any of the following circumstances:

_____

[6] Appellant does not dispute the evidence was sufficient to sustain his firearms and flight to avoid apprehension convictions, which arose out of the police's January 23, 2017, car chase, apprehension of Appellant, and search of Appellant's car. We note that our review confirms the evidence was sufficient to support his convictions. *See* 18 Pa.C.S.A. §§ 6105(a)(1), 6106(a)(1), and 5126(a).

- 24 -

>(1) With knowledge that the property involved, including stolen or illegally obtained property, represents the proceeds of unlawful activity, the person acts with the intent to promote the carrying on of the unlawful activity.

18 Pa.C.S.A. § 5111(a)(1) (bold in original).

The Crimes Code defines criminal use of a communication facility as follows:

>**§ 7512. Criminal use of communication facility**
>
>(a) Offense defined.--A person commits a felony of the third degree if that person uses a communication facility to commit, cause or facilitate the commission or the attempt thereof of any crime which constitutes a felony under this title or under the act of April 14, 1972 (P.L. 233, No. 64),[1] known as The Controlled Substance, Drug, Device and Cosmetic Act. Every instance where the communication facility is utilized constitutes a separate offense under this section.
>
>_____
>1 35 P.S. § 780-101 *et seq.*

18 Pa.C.S.A. § 7512(a) (bold in original).

The Crimes Code relevantly defines corrupt organizations as follows:

>**§ 911. Corrupt organizations**
>
>(b) Prohibited activities.--
>
>(1) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity in which such person participated as a principal, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in the acquisition of any interest in, or the establishment or operation of, any enterprise: Provided, however, That a purchase of securities on the open market for purposes of investment, and without the intention of controlling or participating in the control of the issuer, or of assisting another to do so, shall not be unlawful under this subsection if the securities of the issue held by the purchaser, the members of his immediate family, and his or their accomplices in

any pattern of racketeering activity after such purchase, do not amount in the aggregate to 1% of the outstanding securities of any one class, and do not confer, either in law or in fact, the power to elect one or more directors of the issuer: Provided, further, That if, in any proceeding involving an alleged investment in violation of this subsection, it is established that over half of the defendant's aggregate income for a period of two or more years immediately preceding such investment was derived from a pattern of racketeering activity, a rebuttable presumption shall arise that such investment included income derived from such pattern of racketeering activity.

18 Pa.C.S.A. § 911(b)(1) (bold in original).

The Crimes Code defines conspiracy as follows:

**§ 903. Criminal conspiracy**

**(a) Definition of conspiracy.--**A person is guilty of conspiracy with another person or persons to commit a crime if with the intent of promoting or facilitating its commission he:

> (1) agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime; or

> (2) agrees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime.

18 Pa.C.S.A. § 903(a) (bold in original).

Here, Appellant avers generally that the law enforcement surveillance, intercepted wiretap communications between him and Mr. Maitre, and the testimony of Michael Zelek did not establish Appellant's guilt for the crimes of PWID, dealing in proceeds of unlawful activities, criminal use of a communication facility, corrupt organizations, or conspiracy. We disagree.

Detective Nangle, who was qualified as an expert in the field of drug trafficking investigations, testified the police secured a court order to place wiretaps on the cell phones used by Mr. Maitre, who was reported by various tipsters to be the head of a drug trafficking organization in Chester County. The police determined that a cell phone number (ending in 9811), which belonged to Appellant, had numerous calls and text messages with Mr. Maitre's cell phone number (ending in 9937). Detective Nangle specifically testified he became familiar with Appellant's voice, and he has no doubt Appellant was using the 9811 number. There was no dispute that Mr. Maitre was using the cell phone number ending in 9937.

In one of the intercepted communications, on December 18, 2016, Appellant informed Mr. Maitre that he had collected $10,000.00 for him, and the duo made a plan for Appellant to give it to Mr. Maitre in a Lowes parking lot in London Grove Township. Based on these intercepted communications, Corporal O'Connor set up surveillance in the Lowes parking lot on December 18, 2016, and he observed as Appellant parked his white Mazda next to Mr. Maitre's BMW. He saw Appellant hand Mr. Maitre a package, which based on intercepted communications, was money.

Detective Nangle testified that, in separate intercepted communications between the cell phones of Appellant and Mr. Maitre, Appellant informed Mr. Maitre that he had additional money to give to Mr. Maitre, and Appellant informed Mr. Maitre that he needed an "onion or two," which Detective Nangle

confirmed was a coded reference to an ounce or two of methamphetamine. In response, Mr. Maitre told Appellant to see Mr. Sydenstricker. Video footage from a pole camera outside of Mr. Sydenstricker's house on Chesterville Road showed Appellant entering and exiting the house at various times.

On January 3, 2017, in intercepted communications, Appellant informed Mr. Maitre that he had $7,000.00 to give to Mr. Maitre, and Mr. Maitre told Appellant that one of his suppliers, "Main" (a/k/a Jermaine Jackson), was going to give him methamphetamine. However, communications the next day, on January 4, 2017, revealed "Main" did not bring the methamphetamine, and Appellant told Mr. Maitre he would get it from Mr. Andrews out of Ohio. However, Mr. Andrews was not available as he was in Florida.

Subsequent intercepted communications between Appellant and Mr. Maitre revealed Mr. Maitre, who used various suppliers, was having difficulty getting methamphetamine. Appellant expressed frustration about the delay, and Mr. Maitre told Appellant he could give him some money to hold him over until they could get more methamphetamine. Appellant even traveled to Arizona with Mr. Maitre in a (failed) attempt to purchase methamphetamine. Eventually, Mr. Andrews returned from Florida, and a pole camera caught Mr. Andrews arriving at the stash house on Chesterville Road.

When the police raided the stash house, they seized large quantities of methamphetamine,[7] and Mr. Zelek later testified he was at the house to purchase methamphetamine when the police executed the search warrant. Mr. Zelek testified he sold drugs for Mr. Maitre, and he had many interactions with Appellant, to whom Mr. Zelek referred as Mr. Maitre's "right-hand man." He indicated Appellant collected money from him to give to Mr. Maitre, as well as brought drugs to Mr. Zelek to sell. On one occasion, Appellant brought Mr. Zelek five pounds of methamphetamine and told him it was from Mr. Maitre. As of the time of Mr. Zelek's arrest, he owed Mr. Maitre money as it related to the five-pound delivery.

Based on the forementioned, and viewing the evidence in the light most favorable to the Commonwealth as verdict winner, we have no difficulty concluding the evidence was sufficient to sustain Appellant's convictions for PWID, dealing in proceeds of unlawful activities, criminal use of a communication facility, corrupt organizations, and conspiracy (as to PWID). **See** 35 P.S. § 780-113(a)(30); 18 Pa.C.S.A. §§ 5111(a)(1), 7512(a), 911(b)(1), and 903.

In his next issue, Appellant contends the jury's verdict was against the weight of the evidence. Appellant suggests generally that the evidence

---

[7] Subsequent forensic analysis confirmed the substance was methamphetamine.

- 29 -

presented to the jury was not credible, particularly that of Mr. Zelek and Detective Nangle.[8]

When considering challenges to the weight of the evidence, we apply the following precepts. "The weight of the evidence is exclusively for the finder of fact, who is free to believe all, none[,] or some of the evidence and to determine the credibility of the witnesses." *Commonwealth v. Talbert*, 129 A.3d 536, 545 (Pa.Super. 2015) (quotation marks and quotation omitted). Resolving contradictory testimony and questions of credibility are matters for the finder of fact. *Commonwealth v. Hopkins*, 747 A.2d 910, 917 (Pa.Super. 2000). It is well-settled that we cannot substitute our judgment for that of the trier of fact. *Talbert*, *supra*.

Moreover, appellate review of a weight claim is a review of the trial court's exercise of discretion in denying the weight challenge raised in the post-sentence motion; this Court does not review the underlying question of whether the verdict is against the weight of the evidence. *See id.*

> Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

_____

[8] Appellant raised a weight claim in his post-sentence motion. *See* Pa.R.Crim.P. 607.

- 30 -

*Id.* at 546 (quotation omitted). Furthermore, "[i]n order for a defendant to prevail on a challenge to the weight of the evidence, the evidence must be so tenuous, vague and uncertain that the verdict shocks the conscience of the court." *Id.* (quotation marks and quotation omitted).

Here, the trial court rejected Appellant's weight of the evidence claim, and we find no abuse of discretion. *Talbert*, *supra*. Simply put, the jury considered the evidence linking Appellant to the crimes at issue. The jury found the Commonwealth's witnesses, including Mr. Zelek and Detective Nangle, to be credible. To the extent Appellant requests that we re-weigh the evidence and assess the credibility of the witnesses, we decline to do so as it is a task that is beyond our scope of review. *See Commonwealth v. Collins*, 70 A.3d 1245, 1251 (Pa.Super. 2013) (stating that "[a]n appellate court cannot substitute its judgment for that of the finder of fact"). Thus, we find no merit to Appellant's weight of the evidence claim.

In his next claim, Appellant contends the Commonwealth committed a *Brady* violation. Specifically, he avers the Commonwealth withheld exculpatory cell phone evidence from his own cell phone. That is, Appellant contends there are "pings" and GPS data from his cell phone (ending in 9811), which would demonstrate Appellant was not in the Lowes parking lot or other places averred to by the police's surveillance team.

Relevantly, our Supreme Court has held the following:

To establish a ***Brady*** violation, an appellant must prove three elements:

[1] the evidence [at issue] was favorable to the accused, either because it is exculpatory or because it impeaches; [2] the evidence was suppressed by the prosecution, either willfully or inadvertently; and [3] prejudice ensued.

***Commonwealth v. Lambert***, 584 Pa. 461, 884 A.2d 848, 854 (2005) (citation omitted).

The evidence alleged to have been withheld by the prosecution must have been "material evidence that deprived the defendant of a fair trial." ***Commonwealth v. Johnson***, 572 Pa. 283, 815 A.2d 563, 573 (2002) (emphasis added). "Favorable evidence is material, and constitutional error results from its suppression by the government, if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." ***Id.***

***Brady*** does not require the disclosure of information "that is not exculpatory but might merely form the groundwork for possible arguments or defenses." ***Lambert***, ***supra*** at 856. Similarly, ***Brady*** does not require the prosecution to disclose "every fruitless lead" considered during the investigation of a crime. ***Lambert***, ***supra*** at 857. ***Brady*** sets forth a limited duty, not a general rule of discovery for criminal cases. ***Lambert***, ***supra*** at 854. The burden rests with Appellant to prove, by reference to the record, that evidence was withheld or suppressed by the prosecution. There is no ***Brady*** violation when the appellant knew or, with reasonable diligence, could have uncovered the evidence in question, or when the evidence was available to the defense from non-governmental sources. ***Lambert***, ***supra*** at 856[.]

***Commonwealth v. Paddy***, 609 Pa. 272, 15 A.3d 431, 450-51 (2011) (some

quotations, quotation marks, and citations omitted).

Here, assuming this issue was preserved in the court below, we conclude

Appellant has failed to demonstrate a ***Brady*** violation. Specifically, based on

Appellant's own assertions, to the extent the alleged exculpatory evidence pertaining to the "pings" and GPS location of Appellant's cell phone exists, Appellant knew, or with reasonable diligence, could have uncovered the evidence in question. *See Paddy*, *supra*. Moreover, inasmuch as Appellant could have secured this alleged evidence from his own cell phone carrier or an independent expert, the evidence was available to Appellant from non-governmental sources. *See id.* Simply put, Appellant has not established a *Brady* violation based on the alleged failure of the Commonwealth to provide Appellant with alleged information about his own cell phone. *Id.*

Finally, Appellant challenges the discretionary aspects of his sentence. Specifically, Appellant contends his aggregate sentence of 34.5 years to 69 years in prison is improperly excessive since the trial court abused its discretion in failing to consider the requirements of 42 Pa.C.S.A. § 9721.

Appellant's issue presents a challenge to the discretionary aspects of his sentence. "[C]hallenges to the discretionary aspects of sentencing do not entitle an appellant to review as of right." *Commonwealth v. Derry*, 150 A.3d 987, 991 (Pa.Super. 2016) (citation omitted). Rather, before reaching the merits of such claims, we must determine:

> (1) whether the appeal is timely; (2) whether Appellant preserved his issues; (3) whether Appellant's brief includes a concise statement of the reasons relied upon for allowance of appeal with respect to the discretionary aspects of sentence; and (4) whether the concise statement raises a substantial question that the sentence is inappropriate under the sentencing code.

***Commonwealth v. Corley***, 31 A.3d 293, 296 (Pa.Super. 2011) (citation omitted). Here, assuming, *arguendo*, all of these requirements have been met, we conclude Appellant's sentencing issue is meritless.

Our standard of review concerning the discretionary aspects of sentencing is as follows:

> Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

***Commonwealth v. Hyland***, 875 A.2d 1175, 1184 (Pa.Super. 2005).

42 Pa.C.S.A. § 9721(b) offers the following guidance to the trial court's sentencing determination:

> [T]he sentence imposed should call for confinement that is consistent with the protection of the public, the gravity of the offense as it relates to the impact on the life of the victim and on the community, and the rehabilitative needs of the defendant.

42 Pa.C.S.A. § 9721(b).

Furthermore,

> Section 9781(c) specifically defines three instances in which the appellate courts should vacate a sentence and remand: (1) the sentencing court applied the guidelines erroneously; (2) the sentence falls within the guidelines, but is "clearly unreasonable" based on the circumstances of the case; and (3) the sentence falls outside of the guidelines and is "unreasonable." 42 Pa.C.S.A. § 9781(c). Under 42 Pa.C.S.A. § 9781(d), the appellate courts must review the record and consider the nature and circumstances of the offense, the sentencing court's observations of the defendant, the findings that formed the basis of the sentence, and the

- 34 -

sentencing guidelines. The weighing of factors under 42 Pa.C.S.A. § 9721(b) is exclusively for the sentencing court, and an appellate court may not substitute its own weighing of those factors. The primary consideration, therefore, is whether the court imposed an individualized sentence, and whether the sentence was nonetheless unreasonable for sentences falling outside the guidelines, or clearly unreasonable for sentences falling within the guidelines, pursuant to 42 Pa.C.S.A. § 9781(c).

***Commonwealth v. Bricker***, 41 A.3d 872, 875-76 (Pa.Super. 2012) (citations omitted).

When imposing sentence, a court is required to consider the particular circumstances of the offense and the character of the defendant. In considering these factors, the court should refer to the defendant's prior criminal record, age, personal characteristics and potential for rehabilitation. Where presentence reports exist, we shall…presume that the sentencing judge was aware of relevant information regarding the defendant's character and weighed those considerations along with mitigating statutory factors.

***Commonwealth v. Antidormi***, 84 A.3d 736, 761 (Pa.Super. 2014) (quotation marks and quotation omitted).

In the case *sub judice*, during the May 29, 2024, sentencing hearing, the Commonwealth informed the trial court of Appellant's prior record score, including Appellant's prior convictions for "a string of armed robberies and a shooting." N.T., 5/29/24, at 5. The Commonwealth noted that Appellant served almost twenty years in prison for his earlier convictions, and the instant investigation began in 2016, just four years after Appellant was released from prison. ***Id.*** The Commonwealth provided the trial court with the applicable offense gravity scores for each offense, as well as the relevant sentencing guidelines. ***Id.*** at 5-7.

- 35 -

Detective Nangle testified during Appellant's sentencing hearing that, right after the jury returned its verdict against Appellant, Appellant looked at Detective Nangle and asked how his kids were doing in football. *Id.* at 8. Detective Nangle testified that, in 2018, the police had been provided with information indicating that members of the Maitre drug trafficking organization were offering $40,000.00 as a hit on the life of Detective Nangle and his children. *Id.* Accordingly, Detective Nangle indicated he took Appellant's statement as a threat against his children. *Id.* at 9.

The Commonwealth argued that, in terms of the trial court "crafting a sentence for the protection of the public, impact on the community, and the rehabilitative needs of [Appellant]," the court should remember that "after serving almost 20 years in state prison[,] Appellant reoffended four years later." *Id.* at 11. The Commonwealth averred Appellant "has been given his chance at rehabilitation, and it did not work. What we have at this point is an overwhelming need to protect the public from [Appellant], and an extremely low demonstrated ability of [Appellant] to comply with the laws in the Commonwealth." *Id.*

The Commonwealth further noted that Appellant attempted to place the blame on everyone but himself, and he believed "the police were out to get him." *Id.* at 12. However, Appellant is "manipulative," and he "does not respect the laws." *Id.* The Commonwealth argued Appellant had many chances, and, therefore, the court should impose "a sentence that reflects the

seriousness of these charges[, as well as] the repeated nature of the offenses." ***Id.***

The trial court acknowledged it had a presentence investigation report ("PSI report"). ***Id.*** at 13. Appellant's counsel indicated he had a few corrections to make as it pertains to the PSI report. ***Id.*** Specifically, he clarified Appellant's age is fifty-seven years old as opposed to fifty-six years old as listed on the PSI report. ***Id.*** Also, he noted that the PSI report indicates Appellant has a 1991 conviction in Lancaster County for various crimes, but Appellant has no recollection of the convictions. ***Id.*** However, Appellant's attorney admitted the Commonwealth provided him with Appellant's certified record, and the 1991 conviction is listed on it. ***Id.*** Thus, in the end, Appellant's attorney did not dispute that the convictions existed; however, Appellant just has "no recollection of that occurring." ***Id.***

Appellant's attorney informed the trial court that Appellant has been an addict for most of his life. ***Id.*** Further, he noted that, as it applies to the safety of the community, since Appellant has health issues and would be elderly when released from prison, it is unlikely that he would be in any position to harm the community. ***Id.*** at 15. Also, he argued that prison would be detrimental to Appellant's health conditions, which includes Hepatitis C. ***Id.*** Appellant's attorney argued that giving Appellant an aggregate sentence of ten years to twenty years in prison would be acceptable for Appellant's rehabilitative purposes, as well as give him an opportunity to "have a life"

after he is released from prison. *Id.* at 16.

Appellant declined to make a statement to the trial court, except that he denied making any threats against Detective Nangle's children. *Id.* at 17. The trial court asked Appellant what he meant when he stated during his presentence investigation interview that, if he is going to die in prison, he would "go down fighting." *Id.* Appellant clarified that he meant he would "fight" the conviction through the appeals process. *Id.* at 18. The trial court asked Appellant if he had any remorse for selling drugs into the community, and Appellant responded he "got caught up in the cycle again." *Id.*

The trial court then relevantly indicated the following:

> I did preside over the trial. I heard all of the evidence that was presented. I have read and reviewed the [PSI report]. I've listened to defense arguments[.]
>
> [Appellant], you were released from state prison in 2012, and as of 2016, you were heavily involved in a large drug trafficking organization, huge amounts of drugs that we often don't see in a county court. I agree with the Commonwealth's assessment that a number of these are very distinct crimes that deserve sentences that take into account the seriousness of the individual offenses. I am going to excuse myself for one minute while I do a little bit of math and then I will be right back.
>
> [Recess was taken.]
>
> All right. [Appellant],…I do also want to state on the record that I am not considering what was presented by Detective Nangle here today in court. That is uncharged conduct, and I am not considering that in imposing this sentence. I'm imposing this sentence based on your prior criminal history, which is extensive and extreme, and the extent of your involvement in this large drug organization.
>
> ***
>
> This is an aggregate sentence of 34-and-a-half years to 69 years.

***Id.*** at 19-21.

We find no abuse of discretion. Specifically, contrary to Appellant's assertion, in imposing its aggregate sentence, the trial court considered Appellant's rehabilitative needs under 42 Pa.C.S.A. § 9721(b). Further, the trial court, which acknowledged the PSI report, considered the mitigating factors, along with Appellant's character. ***See Antidormi***, ***supra***. Moreover, the trial court noted the gravity of the offenses in this matter, which greatly impacted the community. Also, given Appellant's participation in this drug trafficking organization just four years after serving a long term in prison, it is clear the trial court considered the need to protect the public. We conclude the trial court imposed an individualized sentence, and the sentence is not "clearly unreasonable." ***See Bricker***, ***supra***. Thus, we find no merit to Appellant's sentencing claim.

After examining the issues contained in the ***Anders*** brief, we agree with counsel that the appeal is wholly frivolous. "Furthermore, after conducting a full examination of all proceedings as required pursuant to ***Anders***, we discern no non-frivolous issues to be raised on appeal." ***Yorgey***, 188 A.3d at 1195. Thus, we grant counsel's petition to withdraw and affirm Appellant's judgment of sentence.

Petition to withdraw as counsel granted. Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 2/10/2025